IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

JULIA COLEMAN,

        Plaintiff,

v.                                                        Civil Action No. 3:12-cv-00682

MASONIC HOME OF VIRGINIA,

        Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on cross-motions for summary judgment. (Dk. Nos. 22 and 24.) The *pro se* plaintiff, Julia Coleman, is a former employee of Masonic Home of Virginia ("Masonic Home"). Coleman alleges that Masonic Home constructively discharged her because of her race and gender, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). Coleman, however, cannot prove either an adverse employment action or that Masonic Home treated her differently than other employees outside of her protected class, two requirements for her Title VII claims. Accordingly, the Court GRANTS the defendant's motion for summary judgment and DENIES the plaintiff's motion for partial summary judgment.

### I. STATEMENT OF FACTS

Coleman filed suit alleging Title VII claims of sexual harassment, retaliation, and discrimination based on race and sex. The Court previously dismissed the claims against one of Coleman's former supervisors, Lee Byrd, in his individual capacity. The Court also dismissed Coleman's sexual harassment and retaliation claims, leaving only her claims of race and gender

discrimination. Based on statute of limitations restrictions, the Court constrained the timeframe of the alleged discrimination to actions occurring after February 22, 2011.

Coleman began work as a housekeeper at Masonic Home, a continuing care retirement community, in 2004. (Dk. No. 24 at 2.) In 2005, Masonic Home reassigned her to the position of Environmental Floor Technician in its Residential Area. (*Id.*) Environmental Floor Technicians perform maintenance and clean floors and carpeted areas according to certain sanitary and antiseptic guidelines. (*Id.*) Jennifer Burton supervised Coleman from the time of her reassignment until Coleman's resignation in November of 2011, although not always as the plaintiff's immediate supervisor. (*Id.*)

Coleman claims that, throughout her employment with Masonic Home, Burton "constantly picked on" her. (*Id.*) As a result, she reported this treatment to Human Resources in 2009, which investigated the complaint and found no particular wrongdoing. (*Id.*) Although Human Resources cautioned Burton to be mindful of Coleman's concerns in the future, Burton and Coleman's difficulties continued. (Dk. No. 24 at 2.) Coleman alleges that, in addition to continuing to pick on her, Burton treated the other EFTs more leniently by allowing them to ignore Masonic Home policies and granting them more overtime. (*Id.*) Additionally, Coleman claims that Burton assigned her over 120 rooms to clean, whereas another Environmental Floor Technician had only thirty.[1] (*Id.*)

In 2011, Masonic Home placed Coleman on two separate performance improvement plans: the first, on February 11, for chronic tardiness, and, the second, on July 5 for damaging a marble floor. (*Id.*) Although Coleman admits to being tardy on twenty-five occasions (but only

---

[1] Coleman alleges that she was assigned 148 rooms to clean whereas Masonic Homes contends that she had 125. Determining the exact number of rooms assigned to Coleman would not change the outcome of this case, however, and is consequently immaterial.

by two or three minutes each time), she disclaims responsibility for the floor damage. (*Id.* at 2-3.) As part of the second performance improvement plan, Masonic Home required Coleman to attend a training session with one of her supervisors, Earl Townes. (*Id.* at 2.) During this training session, Townes made several sexual comments to Coleman. (*Id.*) Coleman completed her training, and Masonic Home took her off the performance improvement plans on September 12, 2011. (Dk. No. 24 at 3.) After her training, Coleman complained to Masonic Home about Townes' comments. (Dk. No 22, Ex. 1 at ¶ 15.) Following an investigation, Masonic Home fired Townes in September 2011. (*Id.*)

On November 25, 2011, Coleman resigned from Masonic Home. (Dk. No. 24 at 2.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Courts have an "affirmative obligation ... to prevent factually unsupported claims and defenses from proceeding to trial" when no genuine dispute as to any material fact exists. *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir.1993) (internal citations omitted). Court look to the facts pled to determine whether a triable issue exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49 (1986).[2] The moving party bears the burden of establishing the nonexistence of a triable issue of fact by "showing ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325 (internal citations omitted). "The judge's inquiry, therefore,

---

[2] Coleman proceeds in this case *pro se*. The Court will liberally construe Coleman's pro se pleadings. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, "the 'special judicial solicitude' with which a district court should view ... pro se [filings] does not transform the court into an advocate." *Weller v. Dep 't of Social Servs.*, 901 F.2d 387, 391 (4th Cir.1990).

3

unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict." *Anderson*, 477 U.S. at 252.

All "factual disputes and any competing, rational inferences [are resolved] in the light most favorable to the party opposing that motion." *Rossignol*, 316 F.3d at 523 (internal citations and quotations omitted). Nevertheless, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. "Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates the other party should win as a matter of law." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 308 (4th Cir.2006). The court may grant summary judgment if the nonmoving party's evidence is only colorable or is not significantly probative. *Anderson*, 477 U.S. at 249–50.

### III. DISCUSSION

A prima facie case of discrimination under Title VII requires the plaintiff to show: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). Coleman's claims fail this standard because she has not shown that she suffered an adverse employment action or that she received less-favorable treatment than similarly situated employees outside of her protected class.

#### A. Adverse Employment Action and Constructive Discharge

An employer takes an adverse employment action by committing a "discriminatory act that adversely affect[s] the 'terms, conditions, or benefits' of the plaintiff's employment." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (quoting *Von Gunten v.*

4

*Maryland*, 243 F.3d 858, 865 (4th Cir. 2001) (abrogated on other grounds by *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006))) (alterations in the original). Coleman does not allege that Masonic Home actually fired her, but rather that its treatment of her amounted to a constructive discharge, a specific type of adverse employment action. *See James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 378 (4th Cir. 2004) (discussing the "ultimate adverse action of constructive discharge, which led [the plaintiff] to resign.")

An employer constructively discharges an employee if it "deliberately makes the working conditions of the employee intolerable in an effort to induce the employee to quit." *Whitten v. Fred's, Inc.*, 601 F.3d 231, 248 (4th Cir. 2010) (quoting *Martin v. Cavalier HotelCorp.*, 48 F.3d 1343, 1353-54 (4th Cir. 1994)) (internal quotations omitted). To establish constructive discharge, the plaintiff must first show that, motivated by improper bias against the plaintiff, the employer intentionally forced the employee's resignation. Second, the plaintiff must show that those intentional acts created an intolerable work environment. *Matvia v. Bald Head Management*, 259 F.3d 261, 272 (4th Cir. 2001).

Courts analyze intolerability using an objective standard. *Matvia*, 259 F.3d at 272 (citing *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 237 (4th Cir. 1999)). The primary question becomes whether a "reasonable person in the employee's position would have felt compelled to resign." *Bristow v. The Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985) (internal quotations omitted). Moreover, an objectively intolerable environment consists of more than simply "dissatisfaction with work assignments, a feeling of being unfairly criticized, or unpleasant work conditions," because these things characterize all workplaces to one degree or another. *Booz-Allen*, 383 F.3d at 187 (quoting *Williams v. Giant Food, Inc.*, 370 F.3d., 423, 435 (4th Cir. 2004)) (internal quotation marks omitted). Courts look at "the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *EEOC v. Fairbrook Medical Clinic, P.A.*, 609 F.3d 320, 328 (4th Cir. 2010).

In making her intolerability claim, Coleman tries to paint a picture of a tense and difficult work environment. In addition to claiming that Masonic Home treated other employees significantly better and that Burton continually harassed and criticized her for minor transgressions, Coleman also describes having a lewd comment directed at her during a training session with her supervisor, Earl Townes. Coleman also claims that after reporting Townes, and playing a tape recording of the comment to Masonic Home's senior leadership, she "did not get a moment of peace" until her resignation. (Dk. No. 12 at 13.)

Coleman's situation was not intolerable. Specifically, the most egregious of these allegations, the comment by Townes, resulted in his swift termination once Coleman reported it to Masonic Home. Further, Townes' comment seems to have been isolated, and Coleman was not subjected to consistently demeaning comments. Additionally, while the relationship between Coleman and her supervisor, Burton, appears to have been tense, Coleman has not met the high threshold for proving intolerability. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("[the] standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code'"). Other than proving a generally unpleasant atmosphere at work, Coleman, at most, can show that Burton made disparaging comments about Coleman's breasts and hair in 2009, nearly two years before she resigned from Masonic Home. These statements are too attenuated to prove that Coleman's work environment was intolerable in 2011, and a reasonable jury would be unable to find intolerability.

Turning next to the deliberateness prong in her race-motivated constructive discharge claim, Coleman alleges that Masonic Home removed her in order to "orchestrate the upward mobility" of a white, male co-worker named Jeramie Jones. (Dk. No. 3, at 6.) She offers two theories to prove that race served as Masonic Home's primary motivator regarding Jones. First, she says that Masonic Home demoted her by transferring her floor cleaning responsibilities to Jones, and the mere fact that Jones, a Caucasian, replaced Coleman, an African-American, proves Masonic Home's racist intent.[3] Second, she submits a comment made to her by her supervisor, Earl Townes, during a training session where Mr. Townes told Coleman that Masonic Home was "training a white employee" to replace her. Coleman interprets this comment to mean that Masonic Home wanted to promote Jones specifically because of his race. Viewed under the appropriate standard, however, this evidence does not raise a material issue of fact, and does not show that Masonic Home intentionally discriminated against Coleman because of race or created an objectively intolerable workplace. The Court will address Coleman's contentions in reverse order.

First, Earl Townes' statement does not indicate any intention by Masonic Home to provoke Coleman's resignation. Townes simply stated that a white employee was being trained to replace Coleman. Nothing indicates that Coleman's race would play a primary role in this upcoming switch. Townes appears have been merely referencing the employee's race as a way to describe Jones. There is no indication that Townes actually knew about or referred to a racist scheme to replace Coleman, and Coleman has introduced no evidence indicating otherwise.

---

[3] Masonic Home disputes this contention, claiming that they never demoted Coleman. Whether Coleman was demoted, however, is immaterial to the outcome of this case. The Court, therefore, will assume that Masonic Home did demote Coleman.

7

Second, Coleman asserts that her treatment, including what she considers a demotion,[4] indicates a deliberate plan to induce Coleman to resign because of her race. Masonic Home's actions, however, belie this assertion. In the months preceding her resignation, Masonic Home placed Coleman on two separate performance improvement plans, the first to address punctuality issues, and the second after Coleman damaged a section of marble floor. Pursuant to the second improvement plan, Coleman received training, in July 2011, on stripping and cleaning marble floors, even though this is the very assignment Masonic Home allegedly gave to Jones several months prior. Masonic Home almost certainly would not spend time and money training Coleman to do a task, which they had assigned to another employee, especially if they wanted to force her resignation. Consequently, in regards to her race discrimination claim, Coleman cannot show that Masonic Home deliberately caused her to resign.

Coleman similarly fails to show any deliberate gender-based discrimination by Masonic Home. Her gender discrimination claim relies solely on statements made by several Masonic Home employees; these statements are at odds with Masonic Home's actions. First, Coleman has submitted several affidavits from past Masonic Home employees, alleging that Burton stated an intention to find a way to fire Coleman. (Dk. No. 13, ex. 2 at 3; ex. 3 at 1.) At best, these affidavits merely prove that Burton did not like Coleman. They do not prove that she intentionally tried to discharge Coleman because of her gender. Furthermore, Burton allegedly made these comments several years prior to Coleman's resignation. (Dk. No. 13, ex. 2 at 3; ex. 3 at 1.) If these statements accurately reflected Burton's mindset, and she disliked Coleman so much that she planned to fire her, it seems unlikely that she would patiently bide her time for several years. Accordingly, Burton's statements are, at best, of marginal value.

---

[4] Coleman does not clearly explain how she was demoted.

8

Coleman also claims that Earl Townes, in addition to making a lewd comment, told her that Masonic Home planned to get rid of her because they needed a man for her position. (Dk. No. 24 at 3.) Just prior to her resignation, however, Coleman satisfactorily completed both performance improvement plans. If a plan to terminate Coleman existed, the events leading to the two performance improvement plans would have presented Masonic Home with an excellent opportunity to carry it out. Furthermore, after Coleman complained to her supervisors about Townes' lewd comment, they conducted an immediate investigation, which resulted in Townes' termination. The fact that Masonic Home swiftly responded to lewd behavior directed at Coleman and allowed her to complete her remedial performance plans makes it even harder to believe that Masonic Home had a deliberate plan to force Coleman to resign. Coleman, therefore, has not shown that Masonic Home committed an adverse employment action.

### B. Disparate Treatment

The fourth prong of a discrimination claim requires the plaintiff to show that the defendant treated her less favorably than similarly situated employees outside of the protected class. *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004). Disparate treatment "is the most easily understood form of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." *Int'l Broth. of Teamsters v. U.S.*, 431 U.S. 324, 335 n. 15 (1977). For a claim of disparate treatment, "[p]roof of discriminatory intent is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Id.* (citing *Arlington Heights v. Met. Housing Dev. Corp.*, 429 U.S. 252, 265-66 (1977)). Coleman can meet this burden by introducing evidence that "the employees dealt with the same supervisor, were subject to the same standards and engaged in the same conduct without such differentiating or mitigating circumstances that would

9

distinguish their conduct or the employer's treatment of them for it." *Smith v. Sec'y. of Army*, No. 1:11-cv-724, 2012 WL 3866487, at *8 (E.D. Va. Sep. 5, 2012). In the instant case, however, Coleman has presented little more than conclusory allegations of differential treatment, which do not meet her burden under this prong.

Coleman, Burton (her supervisor), and Morton and Courtney (her fellow EFTs) are all African-American. Her race-based disparate treatment claim, therefore, must flow from Masonic Home's treatment of Jeramie Jones. Coleman, though, has presented no evidence that Masonic Home treated her less favorably than Jones. The mere fact that Masonic Home replaced her with Jones does not automatically lead to an inference of disparate treatment. In the first place, Masonic Home placed Coleman on two separate improvement plans for sub-par performance in the months leading up to her resignation. Rather than discriminating against her, Masonic Home replaced her with a someone it deemed more diligent. Second, Coleman's complaint is bereft of any instances where Masonic Home gave Jones special treatment or allowed him to engage in behavior for which they punished Coleman. In fact, a few months later Masonic Home fired Jones for violating the dress code policy, indicating that Masonic Home strictly adhered to its published rules when dealing with Jones. Hence, Coleman's claim is completely unsupported. Accordingly, the Court DISMISSES her racial discrimination claim.

Coleman's claim of gender discrimination also fails. Coleman claims that, through Burton, Masonic Home gave her a greater workload than her male co-workers, while giving them more overtime and allowing them to ignore various company policies. Unfortunately, she provides no concrete evidence to support these claims. While Masonic Home did assign Coleman more rooms to clean than Morton, this difference is attributable to the differences in frequency and cleaning intensity required by each assignment. Specifically, Masonic Home

assigned Morton 30 rooms in their Care Center while Coleman was responsible for cleaning 125 rooms in the Residential area. The Care Center contains residents who require "regular nursing care and medical attention." (Dk. No. 22, at 3-4.) These rooms can require cleaning multiple times per day. By contrast, the Residential area contains residents who, for the most part, live independently. Hence, the Residential area requires more sporadic cleaning, and staff members can clean more rooms in the Residential Area than in the Care Center. Masonic Home also retained the same work distribution with Coleman's successor, a male, undercutting her contention that she received a more intense workload due to her gender.

Masonic Home persuasively rebuts Coleman's other allegations. Coleman has presented no evidence to support her claim that Masonic Home allowed other EFTs to ignore the dress code or work a more flexible schedule. Coleman suggests that Morton did not work hard, but has presented no evidence showing that Masonic Home knew about his work habits. In fact, the affidavits from Coleman's co-workers make it appear that Burton, contrary to Coleman's allegations, did not know that Morton was shirking his responsibilities. (Dk. No. 13, ex. 1 at 2.) As noted above, Masonic Home also fired Jones, a male employee, for violating the dress code. Hence, even if Masonic Home took action against the plaintiff related to her attire, no legitimate inference of gender discrimination has been raised. Accordingly, Coleman has not shown that Masonic Home treated her differently from other employees. The Court, therefore, DISMISSES her gender discrimination claim.

## IV. CONCLUSION

For the reasons set forth above, the Court shall grant the defendant's motion for summary judgment and deny the plaintiff's motion for partial summary judgment.

The Court shall enter an appropriate order.

Date: 11/22/13
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge